**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**HERITAGE CHRISTIAN SCHOOLS, INC.,**
   **Plaintiff,**

v.              Case No. 11-C-1067

**ING NORTH AMERICA INSURANCE**
**CORPORATION, et al.**
   **Defendants.**

---

**DECISION AND ORDER**

Plaintiff Heritage Christian Schools, Inc. ("Heritage"), a private school located in Brookfield, Wisconsin, has filed a lawsuit alleging various claims under both federal and state law against ING North America Insurance Corporation ("ING") and Security Life of Denver Insurance Company ("Security Life").[1] Before me now is the defendants' motion to dismiss several counts of the complaint for failure to state a claim on which relief may be granted. See Fed. R. Civ. P. 12(b)(6).

**I. BACKGROUND**

The following facts are taken from the Third Amended Complaint, the allegations of which I accept as true for purposes of this motion.

Heritage was the victim of a fraudulent scheme perpetrated by Richard Incandela and his wife, Barbara Incandela. Between 2004 and 2007, Barbara Incandela was an agent authorized to sell insurance policies underwritten by Security Life and administered by ING.

---

[1] Heritage also named the president of Security Life, Donald Britton, as a defendant, but in a separate order issued today I dismissed the claims against him for lack of personal jurisdiction.

Although Richard Incandela was not licensed to sell insurance and was not formally an agent of Security Life, he also sold Security Life insurance products during that general time period. The Incandelas operated various business entities, including Solutions Enterprise of America, Inc. ("Solutions Enterprise"), and Building Value, LLC ("Building Value").

In 2003, when Heritage was having financial problems, Richard Incandela appeared and proposed a plan for building an endowment for the school that involved purchasing insurance on the lives of various individuals associated with the school. Heritage was interested, and over the next four years it paid over $1.5 million to the Incandelas and their entities, thinking that this money was being used to pay premiums on policies issued by Security Life. In fact, the Incandelas used only about $500,000 of this money to pay premiums on actual insurance policies. They kept the rest for themselves and tricked Heritage by sending it invoices for premiums on non-existent policies. The Incandelas engaged in similar conduct with other small private schools around the country—convincing the schools that they could build an endowment by investing in life insurance policies and then selling the schools non-existent policies and keeping the purported premium payments for themselves. ING and Security Life were aware that the Incandelas were encouraging private schools to invest in life insurance policies as a way to build their endowments and that some schools were actually purchasing policies based on the Incandelas' recommendations. They were also aware that Richard Incandela was not licensed to sell insurance. However, ING and Security Life did not know that, in addition to collecting premiums on actual Security Life policies (and policies underwritten by other ING affiliates), the Incandelas were defrauding the schools by sending them invoices for policies that did not exist.

In April 2007, a school in South Carolina discovered the Incandelas' fraud, and a representative of the school notified Security Life's president, Donald Britton, of the fraud. (Apparently, the representative knew Britton personally and wanted to give him advance notice before taking other action.) Britton referred the matter to ING and Security Life's in-house counsel, and an internal investigation was conducted. By September 2007, the investigation encompassed the Incandelas' dealings with other schools around the country, including Heritage. On September 25, 2007, ING and Security Life sent Heritage a "quality audit" letter. The complaint does not describe the contents of this letter, but apparently it was part of the investigation into the Incandelas' activities. Heritage allowed Richard Incandela to prepare its response to the letter.

On November 16, 2007, ING and Security Life terminated their relationship with Barbara Incandela for cause and told Richard Incandela to stop holding himself out as an agent of ING and Security Life. On November 19, 2007, ING and Security Life sent Heritage a letter stating that Barbara Incandela was no longer an authorized agent of Security Life and that Richard Incandela was not and had never been an authorized agent of Security Life or any ING-affiliated company. The letter stated that a new agent had been appointed to service Heritage's policies. However, the letter did not state that Barbara Incandela had been terminated for cause or that ING and Security Life were investigating her and her husband for fraud. Heritage continued to work with Richard Incandela through the end of 2007 and the beginning of 2008.

Heritage discovered the Incandelas' fraud in April of 2008. At the beginning of that month, and over Richard Incandela's objection, Heritage hired a chief financial officer, Wendall Harris. As part of his investigation into the state of Heritage's finances, Harris contacted ING

3

and Security Life about the status of Heritage's policies. By the end of the month, Harris had determined that Heritage likely was a victim of the Incandelas' fraud.

## II. DISCUSSION

Heritage brings seven claims against ING and Security Life: (1) liability under the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (2) liability under the Wisconsin Organized Crime Control Act ("WOCCA""); (3) fraud; (4) negligence; (5) insurance bad faith; (6) strict-responsibility misrepresentation; and (7) negligent misrepresentation. ING and Security Life move to dismiss the RICO, WOCCA, insurance bad faith, and two misrepresentation claims for failure to state a claim on which relief may be granted.

**A.    RICO and WOCCA**

Because WOCCA was patterned after RICO, Wisconsin courts consider cases interpreting RICO to be persuasive authority as to the interpretation of WOCCA. See, e.g., State v. Mueller, 201 Wis.2d 121, 144 (Ct. App.1996). In the present case, the parties agree that the RICO and WOCCA claims stand or fall together and cite primarily cases decided under RICO. Therefore, I will discuss only RICO.

The purpose of RICO is to combat racketeering—i.e., a pattern of illegal activity carried out as part of an enterprise that is owned or controlled by those engaged in the illegal activity. See Jennings v. Auto Meter Prods., Inc., 495 F.3d 466, 472 (7th Cir. 2007); Midwest Grinding Co., Inc. v. Spitz, 976 F.2d 1016, 1019 (7th Cir. 1992); Black's Law Dictionary 1265–66 (7th ed. 1999) (definition of "racketeering"). To that end, Congress chose to supplement criminal enforcement of its provisions with a civil cause of action for persons whose business or property has been injured by such criminal activity. 18 U.S.C. § 1964(c). To encourage private

enforcement, Congress provided civil RICO plaintiffs with the opportunity to recover treble damages, costs, and attorney's fees if they can successfully establish the elements of a RICO violation. Midwest Grinding, 976 F.2d at 1019. The elements of a RICO violation are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Jennings, 495 F.3d at 472. A pattern of racketeering activity consists of at least two predicate acts of racketeering committed within a ten-year period. 18 U.S.C. § 1961(5). Predicate acts are acts indictable under a specified list of criminal laws, 18 U.S.C. § 1961(1)(B), including mail fraud under 18 U.S.C. § 1341, and wire fraud under 18 U.S.C. § 1343.

Heritage alleges that the Incandelas controlled the conduct of a RICO enterprise—their businesses, Building Value and Solutions Enterprise—through a pattern of wire and mail fraud. The wire and mail fraud involved communications relating to the non-existent insurance policies. The Incandelas are not defendants in this case, but Heritage claims that ING and Security Life are vicariously liable for their RICO violations. ING and Security Life move to dismiss these claims on the ground that, as a matter of law, they cannot be held vicariously liable under RICO.

Initially, I note that this case does not implicate the question of whether a corporation that is the "enterprise" (i.e., the conduit for the illegal activity) can also be a "person" that is liable under RICO. See D & S Auto Parts, Inc. v. Schwartz, 838 F.2d 964, 966–68 (7th Cir. 1988); Liquid Air Corp. v. Rogers, 834 F.2d 1297, 1306-07 (7th Cir. 1987); Haroco, Inc. v. Am. Nat'l Bank & Trust Co., 747 F.2d 384, 401-02 (7th Cir. 1984). In the present case, the alleged enterprise comprises the Incandelas' business entities, Building Value and Solutions

5

Enterprise, but not ING and Security Life, and so the special problems that arise when the corporation is the enterprise do not arise here.

I turn, then, to the question of whether ING and Security Life can be held liable under ordinary principles of agency law—the relevant principles being respondeat superior and apparent authority. Under respondeat superior, an employer is liable for the acts or omissions of an employee done within the scope of employment and in furtherance of the employer's goals. See, e.g., Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 707–08 (7th Cir. 2008); Scottsdale Ins. Co. v. Subscriptions Plus, Inc., 299 F.3d 618, 621–22 (7th Cir. 2002). When the employee does not act in furtherance of the employer's goals but is on a "frolic of his own," the employer is not liable under respondeat superior. Tellabs, 513 F.3d at 708 ("deliberate wrongs by an employee are not imputed to his employer unless they are not only within the scope of his employment but in attempted furtherance of the employer's goals"); Scottsdale Ins. Co., 299 F.3d at 622. However, even if respondeat superior does not apply because the employee was not acting in furtherance of the employer's goals, the employer may be liable under apparent authority. Under apparent authority, "[w]hen an agent who is authorized to make a contract on his principal's behalf uses fraud to induce the contract, the principal is liable even if the agent is acting solely to feather his own nest." Ackerman v. Northwestern Mut. Life Ins. Co., 172 F.3d 467, 471 (7th Cir. 1999); see also Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp., 456 U.S. 556, 565–70 (1982) ("a principal is liable for an agent's fraud though the agent acts solely to benefit himself, if the agent acts with apparent authority"). Apparent authority is designed to promote reliance on the agency relationship: it benefits third parties because it protects them in their dealings with agents, and it benefits

principals because third parties who have this protection will be more likely to deal with the principal's agents. See, e.g., Am. Soc'y of Mech. Eng'rs, Inc., 456 U.S. at 567.

In the present case, Heritage argues that ING and Security Life are liable for the Incandelas' RICO violations under respondeat superior. However, when the Incandelas sent fake invoices to Heritage and stole the money that Heritage remitted, they were not acting to further ING and Security Life's goals. Rather, they were acting to further their own goals, which were at odds with ING and Security Life's. Heritage recognizes this, but it contends that respondeat superior still applies because ING and Security Life benefitted in part from the Incandelas' overall scheme in the form of the approximately $500,000 in premiums that Heritage paid in connection with actual policies. But this much of the "scheme" was not unlawful, and no principle of agency law of which I am aware imputes to the principal liability for unlawful acts that do not benefit the principal simply because the agent also engages in similar, lawful acts that do. Heritage points out that the legitimate policies were not "suitable" investments for Heritage and that Richard Incandela was not licensed to sell them, but these facts are not relevant to the question of whether ING and Security Life are liable for the Incandelas' RICO violations, since selling "unsuitable" investments and selling insurance without a license are not RICO predicate acts. Thus, ING and Security Life are not liable for the Incandelas' RICO violations under respondeat superior.

Heritage does not argue that ING and Security Life are liable for the Incandelas' RICO violations under apparent authority, but for good measure I note that apparent authority is not a viable theory in the RICO context when the agent's acts do not benefit the principal and were not intended to do so. Now, apparent authority does make ING and Security Life liable for the

Incandelas' common-law fraud even though the fraud did not benefit ING and Security Life and the Incandelas were on a frolic of their own, since the fraud was committed through use of the apparent authority in which ING and Security Life had cloaked the Incandelas. Indeed, Heritage has sued ING and Security Life for common-law fraud, and they have not moved to dismiss those counts of the complaint. However, although apparent authority can be used to impute liability for common-law fraud, that does not mean that it can be used to impute liability for the crimes of mail and wire fraud—i.e., the RICO predicate acts—when the agent's acts do not benefit the principal and were not intended to benefit the principal. This is because corporations are criminally liable only when their agents act in behalf of the corporation. See, e.g., Wayne R. LaFave, Criminal Law 747 (5th ed. 2010) (stating that it is "universally accepted" that corporation is not criminally liable if agent's acts are "undertaken solely to advance the agent's own interests or interests of parties other than the corporate employer"). Thus, RICO liability under an apparent-authority theory when the agent's acts do not benefit the principal and were not intended to benefit the principal would not be consistent with ordinary principles of agency law.

Accordingly, because ING and Security Life have not themselves violated RICO and are not vicariously liable under RICO for the Incandelas' violations, defendants' motion to dismiss the RICO and WOCCA counts of the complaint will be granted.

**B.    Insurance Bad Faith**

Heritage contends that Security Life and ING committed the tort of insurance bad faith when they failed to inform Heritage of the results of their investigation into the Incandelas' conduct. Heritage contends that had Security Life and ING informed them of those results,

8

it would have discovered the Incandelas' fraud sooner than it did. ING and Security Life move to dismiss this claim on the ground that the alleged facts do not fit into any recognized claim for insurance bad faith under Wisconsin law.

Wisconsin cases recognize three general categories of insurance bad-faith claims. See, e.g., Roehl Transp., Inc. v. Liberty Mut. Ins. Co., 325 Wis. 2d 56, 73–74 (2010). The first comprises "third-party" bad-faith claims, which arise in the liability-insurance context when the insurance company, which has the right to control the insured's defense, acts in bad faith and subjects the insured to potential liability by failing to settle a third party's claim against the insured for an amount within the policy limits. A variation on this kind of third-party claim occurs when the insurer in bad faith exposes the insured to liability within the deductible amount. The second general category comprises "first party" bad faith claims. In these claims, the insurer unreasonably withholds payment on a claim that the policy clearly covers. The third category involves cases in which a worker's compensation carrier unreasonably refuses to promptly pay an injured worker who is entitled to workers compensation benefits.

Heritage's bad-faith claim does not fit into any of these categories. Heritage contends, however, that these categories are not exhaustive and that new forms of insurance bad faith can be recognized. Generally, Heritage is correct. The Wisconsin Supreme Court has stated that the existing Wisconsin cases do not purport to catalogue all possible bad faith claims. Roehl Transp., 325 Wis. 2d at 75. However, Heritage must still demonstrate that recognizing a cause of action for insurance bad faith under the facts alleged would be consistent with existing insurance-bad-faith principles. See id. at 76 ("The common-law history of insurance bad faith claims in this state requires the court to analyze the facts of the claim presented and

9

determine whether the established principles of the tort of bad faith support recognizing the claim presented as raising a valid cause of action."). As explained below, Heritage has not done that.

The fundamental problem is that ING and Security Life's alleged bad-faith conduct did not involve taking advantage of circumstances created by an insurance contract, which is something that is present in all of the recognized kinds of bad-faith claims. In the third-party context, the insurer takes advantage of its right to control the insured's defense and essentially engages in a form of "gambling with the insured's money." See Roehl Transp., 325 Wis. 2d at 78–80; R.C. Wegman Constr. Co. v. Admiral Ins. Co., 629 F.3d 724, 725-26 (7th Cir. 2011). In the first-party context, the insurer takes advantage of the fact that if it denies a claim that is clearly covered by the policy, the worst that can happen under contract law is that it will be made to pay the amount that it should have paid, plus interest. In the absence of bad-faith tort remedies, the insured, who may not be made whole under contract law alone, might be coerced into settling for less than what he or she is entitled to under the policy. See Randy Papetti, Note, The Insurer's Duty of Good Faith in the Context of Litigation, 60 Geo. Wash. L. Rev. 1931, 1936–37 (1992); New Appleman Insurance Bad Faith Litigation § 5.02[1] (2d ed. 2011) (available on Lexis). In the worker's compensation context, the insurer takes advantage of the fact that worker's compensation is the injured claimant's only source for compensation. See Kranzush v. Badger State Mut. Cas. Co., 103 Wis. 2d 56, 65–66 (1981).

In the present case, ING and Security Life did not take advantage of any circumstances created by the life insurance contracts that Heritage purchased. The alleged bad faith was failing to tell Heritage that it might be a victim of the Incandelas' fraud, and this had nothing to

do with the administration of Heritage's policies. There is simply nothing about the insurance relationship that ING and Security Life exploited in order to obtain an undeserved benefit. Thus, the policy underlying insurance bad-faith claims is not implicated in the present case. Accordingly, Heritage does not have a viable claim for insurance bad faith.[2]

**C.      Misrepresentation**

Heritage asserts claims for strict-responsibility misrepresentation and negligent misrepresentation. These claims are based on two letters that ING and Security Life sent to Heritage: the September 27, 2007 "quality audit" letter, and the November 19, 2007 letter in which ING and Security Life informed Heritage that Barbara Incandela was no longer an authorized Security Life agent and that Richard Incandela never had been an authorized Security Life agent. Heritage alleges that these letters were misleading because they did not reveal the full extent of ING and Security Life's knowledge of the Incandelas' wrongdoing. ING and Security Life move to dismiss these claims on the ground that the Wisconsin Supreme Court has not recognized causes of action for negligent or strict-responsibility misrepresentation based on "nondisclosure." See Kaloti Enters., Inc. v. Kellogg Sales Co., 283 Wis. 2d 555, 570 n.3 (2005) ("We have never held that a claim for strict responsibility for misrepresentation or negligent misrepresentation can arise from a failure to disclose. Therefore, it remains an open question.").

---

[2]This does not mean that Heritage has no viable claim based on ING and Security Life's failure to warn. Heritage brings a negligence claim against ING and Security Life alleging that they breached the standard of care by, among other things, "failing to disclose the risk of [their] agents' fraud to Heritage." (Third Amended Compl. ¶ 183, ECF No. 36.) ING and Security Life have not moved to dismiss that claim.

Heritage contends that its claims are not based on nondisclosure, and that therefore it is irrelevant that the Wisconsin Supreme Court has not recognized negligence and strict-responsibility misrepresentation claims based on nondisclosure. Essentially, Heritage makes a distinction between claims involving "half-truths" and those involving nondisclosures. See Randi W. v. Muroc Joint Unified Sch. Dist., 929 P.2d 582, 591–92 (Cal. 1997) (distinguishing between "misleading half-truths" and "mere nondisclosure"). A half-truth is "a representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter." Restatement (Second) of Torts § 529 & cmt. a (1977). A misrepresentation involving a nondisclosure occurs when the speaker remains silent in the face of a duty to speak. See Eberts v. Goderstad, 569 F.3d 757, 766 n.8 (7th Cir. 2009).

ING and Security Life do not seem to dispute that Heritage's misrepresentation claims would be viable under Wisconsin law if they were based on half-truths rather than nondisclosure. However, they contend that Heritage's claims are more properly characterized as nondisclosure claims. I disagree. Heritage alleges that the affirmative statements made in the September 27 and November 19 letters were misleading because they were incomplete. Heritage has thus alleged that ING and Security Life uttered half-truths. Now, it may be that the statements were not incomplete or that, even if they were, they were not misleading. But ING and Security Life do not seek dismissal on those grounds. Therefore, the negligent and strict-responsibility misrepresentation claims may proceed.

12

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. Heritage's RICO, WOCCA, and insurance-bad-faith claims are dismissed. Its claims for negligent misrepresentation and strict-responsibility misrepresentation remain.

Dated at Milwaukee, Wisconsin, this 30th day of March 2012.

s/ Lynn Adelman<br>
LYNN ADELMAN<br>
District Judge